(No. 15113.—Decree affirmed.)

EDITH M. MACKIE, Appellee, *vs.* HERMAN SCHOENSTADT, Appellant.

*Opinion filed February 21, 1923—Rehearing denied April 11, 1923.*

1. SPECIFIC PERFORMANCE—*general rule as to when a contract will be enforced in equity.* Where a contract for a conveyance is fair and has been entered into without misrepresentation on the part of the vendor and without misapprehension on the part of the vendee, specific performance will be enforced as a matter of right and not as a favor.

2. SAME—*fraud or misrepresentations will not be presumed.* Where a contract for a conveyance is fair upon its face, a vendee who relies upon alleged misrepresentations amounting to fraud in order to defeat a bill for specific performance is required to prove the fraud or misrepresentations by the weight of the testimony.

3. SAME—*when contract for conveyance is not an option contract.* The right of the vendee in a contract for a conveyance to declare the contract void if there are defects in the title which the vendor fails to cure within a specified time, or the right of the vendor, if the vendee fails to perform the contract, to declare it void and retain the earnest money, does not make the contract an option contract, with the right of either party to refuse performance.

4. SAME—*what does not constitute laches in suit for performance.* The fact that the vendor did not file her bill for specific performance until three months after her last tender or last endeavor to secure the performance of the contract without litigation does not amount to *laches* such as will bar her suit, where it does not appear that there was any change in the value of the property or in the situation of the parties which would, by reason of the delay, operate to the prejudice of anyone.

5. SAME—*defendant is bound although he signs by name of firm which does not exist.* A party who enters into a contract in the partnership name which he uses in business is bound thereby although no partnership exists, and in a suit for specific performance of a conveyance he cannot set up the defense that because no such partnership existed the contract lacks mutuality and cannot be enforced by either party.

APPEAL from the Circuit Court of Cook county; the Hon. HUGO M. FRIEND, Judge, presiding.

LEWIS F. JACOBSON, ROY C. MERRICK, and CAMERON LATTER, for appellant.

CHAPMAN, CUTLER & PARKER, (STANLEY RICH, and JOHN P. BARNES, of counsel,) for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

This appeal is from a decree for the specific performance of a contract for the sale of real estate. The bill originally filed January 5, 1920, by Edith M. Mackie, appellee, made Herman Schoenstadt, his sons, Henry and Arthur, and his daughter, Bertha, defendants. An amended bill was filed on December 5, 1921, which was answered. The answer averred the contract of sale was procured by complainant and her agent by misrepresentations and inequitable conduct and by violating a certain agreement, that the contract had been abandoned by the parties, and that complainant had been guilty of *laches.* The cause was heard before the chancellor, and after the evidence was concluded, complainant by leave of court filed an amended supplemental bill, making Herman Schoenstadt sole defendant, and dismissed the suit as to the other defendants. A decree was granted ordering the defendant to specifically perform the contract by completing the purchase of the property, and he has prosecuted this appeal.

The property described in the contract of sale consists of twelve lots in Daniel E. Doherty's subdivision of block 10, all of which face on Archer avenue, and lots 6 and 7 in A. George Mackie's re-subdivision of lots 30 to 37 in Doherty's subdivision. Block 10 is triangular in shape, and is bounded by Archer avenue, Thirty-fifth street and Robey street. In 1910 Mackie sold appellant three lots in his subdivision, facing Thirty-fifth street. Subsequently Mackie died, leaving appellee, his widow, who appears to have acquired her title to the property from her husband, though just in what manner is not shown by the record. Appellant

occupied the lots he bought from Mackie with a moving picture theater. In the contract made in 1910 for the sale of the lots by Mackie to Schoenstadt, Mackie agreed he would not sell any vacant property he owned in block 10 for theater purposes. The contract sought to be specifically enforced is as follows:

"This memorandum witnesseth, that Herman Schoenstadt and Sons hereby agree to purchase at the price of ten thousand ($10,000) dollars the following described real estate, situated in the county of Cook and State of Illinois: Lots one (1) to twelve (12), inclusive, in Daniel E. Doherty's subdivision of block ten (10) in Walker's subdivision of that part south of the canal, of the northwest quarter of section thirty-one (31), township thirty-nine (39), north, range fourteen (14), east of the third principal meridian, in Cook county, Illinois; also lots six (6) and seven (7) in A. Geo. Mackie's re-subdivision of lots thirty (30) to thirty-seven (37), both inclusive, in Daniel E. Doherty's subdivision as aforesaid, in section 31, township 39, north, range 14, east of the third principal meridian, and Edith M. Mackie, a widow, agrees to sell said premises at said price and to convey to said purchaser a good and merchantable title thereto by a general warranty deed, with release of dower and homestead rights, but subject to all taxes and assessments levied after the year 1918, any unpaid special taxes or special assessments levied for improvements not yet completed, and to unpaid installments of special assessments which fall due after 1918 levied for improvements completed; also subject to any party-wall agreements of record, to building line restrictions and building restrictions of record. Said purchaser has paid two hundred fifty ($250) dollars as earnest money, to be applied on such purchase when consummated, and agrees to pay within. five days after the title has been examined and found good or accepted by him, the further sum of nine thousand seven hundred fifty ($9750) dollars at the office of Newton B. Lauren & Co., Chicago, provided a good and sufficient general warranty deed conveying to said purchaser a good and merchantable title to said premises (subject as aforesaid) shall then be ready for delivery.

"A merchantable title guaranty policy made by Chicago Title and Trust Company shall be furnished by the vendor within a reasonable time. In case material defects be found in said title and so reported, then, if such defects be not cured within sixty days after such notice thereof, this contract shall at the purchaser's option become absolutely null and void and said earnest money shall be returned, notice of such election to be given to the vendor; but the purchaser may nevertheless elect to take such title as it then is,

and in such case the vendor shall convey as above agreed, provided that such purchaser shall have first given a written notice of such election within ten days after the expiration of the said sixty days and tendered performance hereof on his part. In default of such notice of election to perform, and accompanying tender, within the time so limited, the purchaser shall, without further action by either party, be deemed to have abandoned his claim upon said premises, and thereupon this contract shall cease to have any force or effect as against said premises or the title thereto or any right or·interest therein, but not otherwise.

"Should said purchaser fail to perform this contract promptly on his part at the time and in the manner herein specified, the earnest money paid as above shall at the option of the vendor be retained by the vendor as liquidated damages, and this shall thereupon become and be null and void. Time is the essence of this contract and of all the conditions hereof.

"The notices required to be given by the terms of this agreement shall in all cases be construed to mean notices in writing signed by or on behalf of the party giving the same, and the same may be served either upon the other party or his agent.

"If the taxes and assessments to be paid by the vendor cannot be paid at time this contract is to be closed, then the vendor is to pay same on or before May 1 next ensuing.

"This contract and the said earnest money shall be held by Alexander Fader for the mutual benefit of the parties concerned, and after the consummation of the sale he shall be at liberty to retain the canceled contract permanently; and it shall be the duty of said Alexander Fader in case said earnest money be retained as herein provided, to apply the same first to the payment of any expenses incurred for the vendor by his agent in said matter, and second to the payment to vendor's broker of a commission of $250 for his services in procuring this contract, rendering the overplus to the vendor.

"Witness the hands of the parties hereto this 29th day of April, A. D. 1919.

HERMAN SCHOENSTADT AND SONS,
EDITH M. MACKIE."

Appellant contends that it is inequitable to enforce a specific performance of the contract (1) because it was not entered into with fairness and without misrepresentation, misapprehension or oppression; (2) it lacks mutuality; (3) the contract is uncertain and ambiguous; (4) it is an optional contract, not enforcible in equity; (5) no tender of performance was ever made by appellee; (6) appellee did

307—26

not prove she had title to the property; (7) appellee was guilty of *laches,* which bars her right to specific performance.

As to the facts and circumstances under which the contract was made the testimony is highly conflicting. Without attempting to set out the substance of the evidence in detail, it will be sufficient to briefly refer in general terms to the proof on the claim of appellant that he was induced to sign the contract through misrepresentation and misapprehension. The substance of appellant's claim upon that question is, that in his contract in 1910 with Mackie for the purchase of the lots on which his theater is located, Mackie agreed he would sell no more lots in that block to be used for amusement purposes. A few years after he had his theater in operation (as we understand, about 1916, 1917 or 1918,) there were carnivals and other amusements given on the property in question, and early in 1919 appellant called appellee by telephone and protested that such use of the lots was in violation of his contract with Mackie. He testified appellee would not do anything about it and told him if he wanted to get rid of the competition to buy the lots, and when he inquired the price, referred him to Fader, a relative of appellee who was in the real estate business, as her representative. In that way he met Fader, and after several interviews they agreed on a price of $10,000 and the contract was signed. The first price made to appellant was $15,000 and his first offer was $5000. Appellant testified he had no other use for the property than to prevent amusements being conducted on it. Fader represented he had a customer who wanted to buy it for that purpose, and appellant agreed to take an option on it at the price agreed upon, so that he could forfeit the cash payment if he decided not to exercise his option. He and his sons investigated the rumor in the neighborhood about someone contemplating buying the property for a moving picture site and testified they ascertained there was no foundation for the rumor; that he decided not to buy the property and

his sons advised against his buying it. Some time after the contract was signed,—just when is not clear,—he notified Fader he would not take the property. Appellant is corroborated by his secretary, Miss Dingman, that he told Fader he would take an option on the property, and Fader represented that was what the contract was. Appellant and Miss Dingman testified they never read the contract, but Miss Dingman copied the legal description from it. Both testified appellee was not present when it was signed; that Fader was in a hurry and said he would take the contract to appellee for her approval and if she disapproved the cash payment would be returned. Appellant's son Arthur testified he was in an adjoining room when the contract was signed, and that Fader said the instrument was an option, and if appellant decided he did not want to take the property all he would lose would be the cash payment. Appellant and Arthur testified they told Fader over the telephone appellant would not take the property, and Fader said that would be all right.

Appellee testified she was the owner of the lots. Early in 1919 appellant called her by telephone and asked if the property was for sale. She referred him to Fader. Appellant complained that there were other shows being held on the premises, but appellee had never authorized it and knew nothing about it. She did not suggest to appellant the way to get rid of the other shows was to buy the property. Appellee was in appellant's office twice with Fader in connection with the proposed sale, before the parties agreed. At their second conference they agreed on a price of $10,000, and in May, 1919, appellee and Fader went to appellant's office with a contract prepared by Fader, and there, in appellant's office, it was signed by appellant and appellee. They were in the office from a quarter of an hour to a half hour. Appellee did not remember anything about any talk that if appellant did not buy the property he would lose the $250 cash payment.

Fader testified the appellant called him up and inquired about buying the property, as he had previously been notified by appellee she had referred appellant to the witness. He had several interviews with the appellant in March and April, 1919. At first they could not agree on a price. At least at one of the interviews appellee was present in appellant's office. They finally agreed upon a price. Witness prepared a contract and he and appellee took it to appellant's office, where both the parties, appellant and appellee, signed it, and appellant gave witness a check for $250. Witness next saw appellant at his office about the middle of May, when he presented appellant with a letter from the Chicago Title and Trust Company, and asked if he would close the deal on the letter or wait until the policy was issued. The next time he saw appellant, witness and Mrs. Mackie called on him at his office with a deed. Appellant did not want to close the transaction at that time,—complained he was short of money,—and the matter was postponed until August. After that time witness went to the appellant's office many times but could not see him. He was present at appellant's office when lawyer Rich tendered appellant's son Arthur a deed and guaranty policy, and asked that the contract be performed. He testified that appellant wanted to buy the lots,—that he knew more about them than witness did,—and witness did not tell him anything. He testified there was not a word said about an option; that he never told appellant it was an option contract. Witness denied there was any hurry about the matter at the time the contract was signed. He testified the property was listed for sale about four years with the real estate firm where he had his office and they had had no offer to purchase before appellant made an offer, but after the contract was made there were several persons who wanted to buy the property.

It will be seen from this outline of the testimony on the question of misrepresentation and misapprehension the tes-

timony is in irreconcilable conflict.  Whether appellant sustained his claim depended on the credibility of the witnesses. The chancellor heard the testimony in open court and found against the claim of appellant that the contract was signed under misapprehension, induced by misrepresentation of appellee or her agent.  Unless we could say that finding was palpably contrary to the weight of the testimony we would not be justified in reversing the decree on that ground.  It is true, as counsel for appellant contends, specific performance rests within the sound discretion of the court.  The contract must be fair and must be entered into without misrepresentation on the part of the vendor and without misapprehension on the part of the vendee.  If the contract is unjust and inequitable a court of equity will not enforce its specific performance even though it is a legal contract enforcible in a court of law, but if the contract is free from objection specific performance will be enforced as a matter of right and not as a favor.  (*Woodrow* v. *Quaid,* 292 Ill. 27; *Africani Loan Ass'n* v. *Carroll,* 267 id. 380; *Miller* v. *Clark,* 301 id. 273.)  The evidence shows appellant to be a man of intelligence, rather extensively engaged in managing and conducting theatrical enterprises for corporations largely owned by him.  He admits he had signed several option contracts for the purchase of real estate and must have been familiar with them.  He had known the property for at least ten years, during which time he had conducted a motion picture theater in the same block.  There is no proof of the market value of the property or that $10,000 is an excessive price for it.  The misrepresentations relied on by appellant amount to a fraud, which is an affirmative defense, which appellant was required to prove like any other fact.  Fraud will not be presumed.  (*Woodrow* v. *Quaid, supra.*)  To reverse this decree on the ground of fraud or misrepresentations we would have to hold it was proved by the weight of the testimony.  This we cannot do.

The contract itself refutes the contention that it is uncertain or ambiguous. (*Ullsperger* v. *Meyer,* 217 Ill. 262.) The contract is not an option contract, as contended by appellant. "It is only when the contract stipulates for one of two things in the alternative—the performance of certain acts or the payment of a certain amount of money in lieu thereof—that equity will not decree a specific performance of the first alternative." (*Koch* v. *Streuter,* 218 Ill. 546.) The right of the vendee to declare the contract void if there are defects in the title and the vendor fails to cure them within a specified time, or the right of the vendor, if the vendee fails to perform the contract, to declare it void and retain the earnest money paid, does not make the contract an option contract, with the right in either party to refuse performance.

It is contended there was no proper tender of performance by appellee and that she did not furnish proof of title in her. We think the proof shows appellee tendered a warranty deed in performance on her part. She was unable to tender the deed to appellant personally, but she and her agent attempted to do so but were unable to see him. She finally made a tender to one of his sons of the deed, guaranty policy and tax receipts, for appellant, but his son refused to accept. Appellee's attorneys wrote a letter addressed to Herman Schoenstadt & Sons, informing them appellee had deposited with Lauren & Co. a deed signed, acknowledged and stamped, also a guaranty policy of the Chicago Title and Trust Company in conformity with the contract, to be delivered on payment of $9750. The contract bound appellee to convey a good and merchantable title by warranty deed. Appellant paid $250 cash on the contract and agreed to pay the balance within five days after the title had been examined and found good or had been accepted by him. Appellee was to furnish in a reasonable time a guaranty policy made by the Chicago Title and Trust Company. She did procure and tender the guaranty pol-

icy, and while it was not an abstract of the title, the policy was reasonable proof appellee's title was good. She never agreed to furnish an abstract. In fact, it is entirely certain from the evidence appellant's failure to perform was not based on a failure of appellee to tender performance or on her failure to make proof of title. He testified he decided he did not want the property, and notified Fader, appellee's agent, that he would not take it.

Appellant also contends appellee was guilty of *laches* in bringing her suit for specific performance, and the delay is invoked as a bar to its maintenance. Appellee's testimony shows the efforts on her part to secure the performance of the contract did not cease until October, 1919. The bill was filed in January, 1920. It does not appear there had been any change in the value of the property or in the situation of the parties which would operate to the prejudice of anyone by reason of the delay. This is not a case where *laches* may be invoked as a bar. *Cohen* v. *Segal,* 253 Ill. 34.

Appellant contends there is a lack of mutuality in the contract, in that it is not enforcible by either party. Counsel say that had appellee refused to perform the contract and a suit had been commenced against her she could have successfully defended on the ground that it could not be definitely determined to whom she had agreed to sell and who was therefore authorized to prosecute the action. We think there is no merit in this point. Schoenstadt himself signed the agreement in his office, as stated, using the trade name under which he operated or did his business. Appellee bound herself to sell the property at an agreed price under the terms of the agreement, and who comprised or was meant by "Herman Schoenstadt & Sons" was a matter possible to be shown or proven without any great effort. As a general rule, specific performance will not be decreed where mutuality of obligation and remedy does not exist,— that is, if a contract is incapable of being enforced against one party, that party is equally incapable of enforcing it

against the other. It is true there was no such partnership as Herman Schoenstadt & Sons. Appellant testified that was his trade name; that his sons assisted him and were paid salaries. When that was disclosed by the testimony the amended supplemental bill was filed. Where a party enters into a contract in a partnership name and no such partnership exists he may be bound thereby. (*American Nat. Bank* v. *Wood,* 151 Pac. 507.) There was no want of mutuality in the contract.

The decree is affirmed.

*Decree affirmed.*